IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| In Re: ) | |
| ) | |
| VINCENT T. DIAL ) | Case No. 10-01330-TOM-13 |
| ) | |
| Debtor. ) | |

## MEMORANDUM OPINION AND ORDER

This case came before the Court for trial on October 5, 2011, on the Motion for Relief from Stay and Co-Debtor Stay ("Motion for Relief") filed by James Arthur. Appearing before the Court were Thomas Buck and Blair Clinton, counsel for the Debtor; Rebecca Bozeman, counsel for James Arthur; Mary Frances Fallaw, counsel for the Chapter 13 Trustee; Debtor and James Arthur. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 151, and 157(a) (1994) and the District Court's General Order Of Reference Dated July 16, 1984, As Amended July 17, 1984.[1] This is a core proceeding arising under Title 11 of the United States Code as defined in 28 U.S.C. § 157(b)(2)(A) and (G).[2] This Court has considered the pleadings, arguments of counsel, the trial

---

[1] The General Order of Reference Dated July 16, 1984, As Amended July 17, 1984 issued by the United States District Court for the Northern District of Alabama provides:

> The general order of reference entered July 16, 1984 is hereby amended to add that there be hereby referred to the Bankruptcy Judges for this district all cases, and matters and proceedings in cases, under the Bankruptcy Act.

[2] 28 U.S.C. §157(b)(2)(A) and (G) provide as follows:

(b)(2)Core proceedings include, but are not limited to–
(A) matters concerning the administration of the estate;

. . .

(G) motions to terminate, annul, or modify the automatic stay[.]

1

testimony of Debtor and Arthur, the exhibits, and the law, and finds and concludes as follows:[3]

FINDINGS OF FACT[4]

James Arthur ("Arthur") holds a mortgage dated September 1, 2009, on three parcels of real property owned by Debtor and located in Bessemer, Alabama at 220 3rd Street North (Debtor's "Home"), 214 4th Avenue North ("Car Lot"), and 201 - 203 4th Avenue North ("Commercial Building"). The mortgage secures a balloon note, also dated September 1, 2009, in the amount of $42,000.00, with regular monthly payments of $860.93 and a maturity date of September 1, 2014.

Debtor originally had a loan from "Jeffco"[5] that was secured by a mortgage on the Commercial Building only. Debtor approached Arthur about refinancing the loan; however, Arthur's willingness to refinance was conditioned upon Debtor mortgaging the Home and Car Lot as additional collateral. Approximately $28,000.00[6] of the loan proceeds were used to pay off the Jeffco mortgage with the remaining proceeds earmarked for improvements and repairs to the Commercial Building including repairs of broken windows and repairs to the roof, electrical system, bathroom, and kitchen, the installation of safety guards on plate glass windows, and the replacement

---

[3] This Memorandum Opinion constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to contested matters in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Bankruptcy Procedure 9014.

[4] Pursuant to Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of the contents of its own files. *See ITT Rayonier, Inc. v. U.S.*, 651 F.2d 343 (5th Cir. Unit B July 1981); *Florida v. Charley Toppino & Sons, Inc.*, 514 F.2d 700, 704 (5th Cir. 1975).

[5] Both Arthur and Debtor made references to "Jeffco" at trial. This entity is referred to as "Jefferson Mortgage" on Schedule D and as "Jefferson RE" on the Good Faith Estimate for the loan transaction introduced at trial (Arthur's Exh. 6). The entity will be referred to as "Jeffco" throughout this Memorandum Opinion.

[6] Arthur testified approximately $28,000.00 was used to pay off the Jeffco mortgage on the Commercial Building. The Good Faith Estimate reflects a payoff of either $25,678.79 or $26,678.79 - the number is not discernable on the copy of a fax introduced into evidence.

of the door to the side entrance. Arthur claims the improvements were never made; however, upon further questioning Arthur admitted many repairs had been done.[7] Arthur testified that some loan proceeds remaining after the payoff to Jeffco and other closing expenses were placed in an escrow account. Further details concerning this escrow were never made clear to the Court. Debtor testified that he had to provide proof that work had been done before he could receive any money from the escrow account.

Only one month after the loan transaction Debtor filed a chapter 13 case which was dismissed in February 2010.[8] Debtor filed the current case on March 2, 2010, and according to the plan confirmed on June 30, 2010, he was two months behind on the debt to Arthur as of the filing date. The plan proposed to cure arrears of $2,000.00 with fixed monthly payments of $100.00 beginning October 1, 2010. At first Arthur stated he had not received the $1,200.00 that should have been paid through the Trustee's office between October 2010 and the time of trial, but upon questioning by the Trustee's counsel, Arthur admitted having received $1,311.77 as indicated on the Trustee's interim report dated October 5, 2011.

To prove what payments Debtor has missed a number of pleadings have been filed and exhibits introduced by Arthur, including a Proof of Claim,[9] a Fact Summary Sheet and Affidavit

---

[7] According to Arthur the side door has been installed and the roof repair has been completed, but as of the last time he inspected the property there was no electrical service. Debtor testified that the only time the electricity had been off was briefly when work was done to the barber shop. Debtor testified that only the kitchen repairs remain uncompleted.

[8] 09-06046-TOM-13.

[9] To further complicate matters, Debtor's wife, Delois Dial, is a debtor in a separate chapter 13 case, 10-06586-BGC-13. The Proof of Claim (Debtor's Exh. 1) filed in her case in June 2011 shows arrears in the amount of $5,006.71. While the Claim does not contain an attachment itemizing the arrears, the Court will take judicial notice of the consent order entered in Mrs. Dial's case on May 10, 2011 allowing Arthur to file a claim "to reflect the arrearage that has accrued as of April 30, 2011 (notwithstanding the earlier arrearage claim in companion case, Vincent Dial Case # 10-01331)" and providing for notice and an opportunity to cure before the

3

filed in conjunction with the Motion for Relief, and an Itemization of Accounts ("Itemization") allegedly identifying which monthly payments have been made and which ones have not. Arthur's Exh. 1. The Itemization also lists the fees and costs Arthur has incurred including property taxes for 2010[10] and a charge for two years' premiums for hazard insurance that he obtained with the belief that Debtor had no insurance. This belief was based on his receipt from Debtor's insurance company of at least four notices (dated May 2011, June 2011, August 2011, and September 2011) that Debtor's policy would be cancelled for nonpayment. The notices, which were admitted into evidence, are entitled "Notice of Intent to Cancel" and each contains a message in the middle of the page, in capital letters and bold print:

> **THIS "INTENT" DOES NOT AFFECT POLICY COVERAGE. IT IS A WARNING - THE CANCELLATION NOTICE WILL BE ISSUED ON THE SPECIFIED DATE IF PAYMENT IS NOT RECEIVED.**

Arthur's Exh. 2. Debtor testified that he always paid the premium by the due date, and has now paid the policy premiums through the month of March 2012.

Debtor contends that he attempted to pay approximately three payments in 2011 that Arthur refused accept. Because Debtor had previously made payments with NSF checks Arthur required that Debtor make payments in cash or by money order. Arthur refused at least one payment tendered by check but gave Debtor the opportunity to come back with cash; the Debtor declined to do so. According to Debtor's testimony Arthur has refused at least one payment tendered in cash.

---

stay would lift. It is not clear whether "notwithstanding the earlier arrearage claim" means the Claim filed in Delois's case does not include the February and March 2010 payments on the Proof of Claim filed in Debtor's case.

[10] The Itemization reflects Arthur paid property taxes for 2011 but testimony and the receipt from the Jefferson County Tax Collector's office introduced into evidence (Arthur's Exh. 4) establish that Arthur paid the 2010 property taxes.

4

One exhibit offered and admitted without objection is Arthur's Exhibit # 6. The first page of the exhibit is entitled "Good Faith Estimate." Arthur testified that this exhibit demonstrated or proved the required repairs Debtor agreed to make to the building. As this Court noted on the record, this exhibit includes several pages that were paper clipped (not stapled) together. After a review of the pages and the fax headers, it is clear this document is not in order, is probably not a complete document and very well may be pages from different documents just clipped together and offered at trial. Thus, although some of the information may be correct, this exhibit is neither compelling nor persuasive, is probably incomplete and not reliable.

The Commercial Building is now producing income for the Debtor. He has leased for $1,000.00 per month a portion of the space as an event center and has a verbal lease with three barbers who collectively pay $1,200.00 monthly. In addition, the Commercial Building houses a car wash operated by Debtor from which he brings in an average of $1,500.00 to $1,600.00 per month. No testimony was offered as to whether the Car Lot is profitable.

Debtor testified that he is current with his house payments and is making payments on the Car Lot in accordance with a strict compliance order entered in this case. He has been making his plan payments to the Trustee, and per the interim statement dated October 5, 2011, he is in line to pay off his case a few months early.

## CONCLUSIONS OF LAW

Section 362(d) of the Bankruptcy Code provides:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay--
    (1) for cause, including the lack of adequate protection of an
    interest in property of such party in interest;
    (2) with respect to a stay of an act against property under

>       subsection (a) of this section, if--
>           (A) the debtor does not have an equity in such
>           property; and
>           (B) such property is not necessary to an effective
>           reorganization[.]

Because Arthur's Motion for Relief does not specify whether he seeks relief under Section 362(d)(1) or (2) the Court will address both. The initial burden of proof of establishing a prima facie case under either subsection rests with the movant; thereafter, the burden shifts to the debtor. *In re Powell*, 223 B.R. 225, 232 (Bankr. N.D. Ala. 1998).

The Court can quickly dispose of any argument that stay relief is due to be granted under Section 362(d)(2) and will thus address it first. To obtain relief under this subsection Arthur must demonstrate both that Debtor does not have equity in the property and that the property is not necessary to an effective reorganization. 11 U.S.C. § 362(d)(2)(A) and (B); *see also Moulton v. Deutsche Bank National Trust Co. (In re Moulton)*, 393 B.R. 752, 766 (Bankr. N.D. Ala. 2008). In other words, if Arthur establishes a prima facie case under one prong but not the other he is not entitled to stay relief under Section 362(d)(2). In calculating the amount of equity a debtor has in property, this Court has noted that "[m]ost courts hold that a debtor lacks equity when the balance of all debts secured by liens on the property exceed the fair market value of the property." *Powell*, 223 B.R. at 235. According to the evidence and testimony presented at trial the Commercial Building has a value of $28,200.00, the Car Lot has a value of $63,000.00, and the Home has a value of $90,000.00.[11] A review of the claims filed in this case reveals that the properties are subject to

---

[11] Debtor's amended Schedules A, Real Property (Doc. 62) and D, Creditors Holding Secured Claims (Doc. 63) are rather confusing with regard to the property values. On Schedule A the value of the Home is $100,000.00 but on Schedule D the value is $61,900.00. Although the Commercial Building secures the debt to Arthur, it is only on listed Schedule A with a value of $21,000.00. The Car Lot has a value of $42,000 according to Schedule A, and values of both $420,000.00 and $21,000.00 according to Schedule B. Presumably $420,000.00 is a

the following liens: America's Servicing Company holds a first mortgage on the Home which secures a debt of $63,843.25; Household Finance Corporation of Alabama holds a second mortgage on the home which secures a debt of $31,598.25; Jeffco holds a first mortgage on the Car Lot securing a debt in the amount of $24,493.00; Arthur has a first mortgage on the Commercial Building, a second mortgage on the Car Lot, and a third mortgage on the Home securing a claim of $42,000.00.[12] The properties have a collective value of $181,200.00, and the debts secured by mortgages on these properties total $161,934.50.[13] Based on the evidence before the Court, Debtor has equity in the property and thus Arthur is not entitled to relief from the stay under Section 362(d)(2).

Accordingly, it is not necessary to analyze the second prong of this subsection but the Court will nonetheless briefly address the issue. Section 362(d)(2)(B) asks whether the property subject to the stay relief motion is "necessary to an effective reorganization," which has been explained as:

> [N]ot merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization that is in prospect. This means ... that there must be "a reasonable possibility of a successful reorganization within a reasonable time."

---

typographical error and should be $42,000.00 instead. These figures are different from the values established at trial. Debtor's testimony as to the values of the Home and Car Lot were uncontested by Arthur. According to the 2010 tax receipt from the Jefferson County Tax Collector introduced into evidence by Arthur, the value of the Commercial Building is $28,200.00. The receipt was introduced into evidence without objection.

[12] In his Itemization Arthur claims late fees in the amount of $430.50 and "administrative fees" of $4,407.50 for a total of $4,838.00. The administrative fees include insurance premiums in the amount of $1,481.00; it is questionable whether these charges should be allowed. *See infra* n.14. Nonetheless, there is equity in the property even if all of Arthur's claimed fees and expenses of $4,838.00 are allowed.

[13] Based on the above figures the first and second mortgages on the Home exceed its value. For practical purposes the debt to Arthur is secured by the Commercial Building and the Car Lot, collectively valued at $91,200.00. Because the sum of both encumbrances on the properties is $66,895.47, Debtor has equity.

7

*Community West Bank v. HSD Partners, LLC (In re HSD Partners, LLC)*, 451 B.R. 636, 638 (Bankr. S.D. Ga. 2011) (*quoting United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 375–76, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988)). Assuming for the sake of discussion that there is no equity in the property, Arthur still must show Debtor does not need the properties to successfully reorganize, or that there is no reasonable possibility of successful reorganization at all.

There is no doubt that Debtor needs these properties subject to the Motion for Relief in order to successfully reorganize. One of the properties is Debtor's Home, which is generally necessary for an effective reorganization in chapter 13 cases. *See In re Ramos*, 357 B.R. 669, 672 (Bankr. S.D. Fla. 2006); *Central Bank v. Thomas (In re Thomas)*, 121 B.R. 94, 108 - 109 (Bankr. N.D. Ala. 1990). Debtor's undisputed testimony was that the Commercial Building produces income necessary for the Debtor to remain in this case. Furthermore, it appears Debtor can pay off his case and receive a discharge in a timely manner. In fact, as it stands Debtor is poised to pay the case off early. Arthur has not established a prima facie case for stay relief under either prong of Section 362(d)(2) and his motion is due to be denied.

Alternatively, Arthur could obtain relief from the stay pursuant to Section 362(d)(1). To obtain relief under this section, Arthur must show there is "cause" to lift the stay. "Cause" is not defined in the Code and as a result courts generally look at the "totality of the circumstances" in each case to determine whether there is cause for relief from the stay. *In re BFW Liquidation, LLC*, No. 09-00634-BGC-11, 2009 WL 8003536, at *1 (Bankr. N.D. Ala. Sept. 14, 2009)(Cohen, J.). As Judge Cohen explained:

> In determining "cause," a court should "consider the policies underlying the Bankruptcy Code as well as the competing interests of the creditor, debtor, and other parties in interest" when exercising its discretion in granting a motion for relief for cause. Thus, cause is an inherently broad and flexible concept, allowing the

8

Case 10-01330-TOM13   Doc 157   Filed 11/03/11   Entered 11/03/11 13:52:17   Desc Main Document   Page 8 of 13

bankruptcy court to resolve matters based on the unique facts of each situation. *BFW Liquidation*, 2009 WL 8003536, at *1 (citation omitted). The parties' conduct, motives, and good or bad faith are just a few factors that may be examined when looking at the totality of the circumstances. *In re Mack*, 347 B.R. 911, 915 (Bankr. M.D. Fla. 2006).

Among other things, Arthur claims Debtor has not made several post-petition monthly payments, has not made repairs financed by Arthur, did not pay property taxes, and did not maintain insurance coverage.

First, Arthur's testimony, the exhibits admitted at trial, and the pleadings are somewhat inconsistent. While it is obvious that Debtor has missed payments both pre-petition and post-petition, it is not clear how many payments have been missed or the amount Debtor is in arrears. The evidence Arthur has put before the Court is less than credible. For example, the Itemization indicates Debtor made the March 2010 payment but Arthur's Proof of Claim shows Debtor is past due for the February 2010 and March 2010 payments. Furthermore, there is no way to reconcile the Itemization with the Affidavit and Fact Summary Sheet filed by Arthur in support of his Motion for Relief; the documents are contradictory. The Affidavit and Fact Summary Sheet show nine consecutive post-petition payments past due from December 2010 through August 2011. The Itemization does not mention the December 2010 payment at all. Some payments shown as having been received on the Itemization are shown on the Affidavit as not having been received. The Itemization itself is inconsistent. The March 2011 payment is listed once in the "not received" column and twice in the "received" column. The April 2011 payment is listed as having been received twice. At best, the inconsistencies between the documents prepared by Arthur call into

9

Case 10-01330-TOM13    Doc 157    Filed 11/03/11    Entered 11/03/11 13:52:17    Desc
Main Document    Page 9 of 13

question his accounting practices.[14] Moreover, Arthur's testimony is inconsistent. At the beginning of the trial Arthur denied having received $1,200.00 through the Trustee but later admitted to having received $1,311.77. Arthur testified that the money received from the Trustee had been taken into account on his Itemization but he was unable to identify where the payments were credited. In short, Arthur's evidence and testimony are lacking in reliability and credibility.

Second, Arthur claims that Debtor has not used the excess loan proceeds to make the anticipated repairs and improvements to the Commercial Building. If this were true, Arthur might have a colorable claim that he lacks adequate protection since money he loaned for improvements - which should increase the property value - had not been so used. However, Arthur has admitted that many of the repairs have been done.[15] There is no evidence that any of the proceeds have been improperly used by Debtor. It appears unlikely that Debtor *could* have improperly used any proceeds. Per Arthur's testimony and the Good Faith Estimate introduced at trial, $9,559.09 was placed into an escrow account; it is not clear who had control of the account, but according to Debtor's testimony he had to provide proof that work was done before any money was disbursed out of the escrow account.

Third, Arthur contends that he had to pay property taxes for one year and hazard insurance premiums for two years because Debtor had not made the payments. Debtor did not dispute that

---

[14] The "Good Faith Estimate," Arthur's Exhibit 6, as previously noted, is another example of Arthur's questionable record-keeping. The seven-page "document" is not a single document at all. The fax headers on the top of most pages do not match. Some pages do not contain fax headers. One page contains two fax headers. Most pages are obviously unrelated to each other. It is not clear what Arthur intended to prove with this document but it is of little, if any, evidentiary value.

[15] Arthur admits the side door has been installed and the roof has been repaired but disputes the electrical work has been completed. Debtor testified that the electrical work has been done and only the kitchen repairs remain.

10

Arthur paid the 2010 property taxes on the Commercial Building. Debtor does dispute that he allowed the hazard insurance to lapse. According to Arthur, he received a copy of an insurance binder only and not a copy of the actual insurance policy naming him as loss payee. The crux of Arthur's argument, however, is that he received at least four notices that Debtor's insurance had been cancelled. The notices, which were admitted into evidence, are entitled "Notice of Intent to Cancel" and each contains a conspicuous message in the middle of the page:

> **THIS "INTENT" DOES NOT AFFECT POLICY
> COVERAGE. IT IS A WARNING - THE CANCELLATION
> NOTICE WILL BE ISSUED ON THE SPECIFIED DATE
> IF PAYMENT IS NOT RECEIVED.**

Arthur produced no actual notices of cancellation. Debtor testified that he always made each payment by the due date, and has now paid the policy premiums through March 2012. There is no evidence that Debtor has ever failed to keep the Commercial Building insured and thus Arthur cannot claim a lack of adequate protection on this basis.

Certainly Debtor is not the ideal mortgagor, but Arthur has not established a prima facie case that the stay should be lifted. Debtor has missed several monthly post-petition mortgage payments, but as his counsel noted, the arrears could be included in Debtor's bankruptcy case and the case should still pay out on time. In addition, some, although apparently not many, payments are past due because of Arthur's refusal to accept them.[16] Debtor is making his payments to the Trustee and Arthur is receiving monthly payments on the pre-petition arrearage. Although Debtor did not pay

---

[16] Debtor contends that he attempted to pay the June or July, August, and September 2011 payments but Arthur refused to take them. Because Debtor had previously made payments with NSF checks Arthur required that Debtor make payments in cash or by money order. Arthur refused at least one payment tendered by check but gave Debtor the opportunity to come back with cash; the Debtor declined to do so. According to Debtor's testimony Arthur has refused at least one payment tendered in cash on the day of a court hearing.

11

the 2010 property taxes he has maintained property insurance. Debtor has apparently made most of the repairs and improvements contemplated when the loan was made. There is no evidence that the properties subject to the mortgage are diminishing in condition or value.

The much-quoted policy underlying the Bankruptcy Code is to give a debtor a fresh start. It is not uncommon for a debtor in bankruptcy to be in arrears on a mortgage debt, vehicle debt, or other secured debt; such arrears are more often than not the reason behind a bankruptcy filing. Granted, the amount of arrears should not increase after the petition is filed, but again, such scenario is not unheard of in bankruptcy and under the facts of this particular case does not constitute cause. There is no evidence that Debtor has acted in bad faith, or that he filed this case with a motive other than to straighten out his finances. Weighing Debtor's need to keep the properties against Arthur's interests in obtaining relief from stay, the Court finds there is no cause to lift the stay at this time.

Although Arthur has not presented sufficient evidence to lift the stay immediately, there has been a default established and the Debtor must meet his responsibilities under the mortgage. Debtor shall make each and every mortgage payment that is due on the Arthur mortgage to the Chapter 13 Trustee; Debtor shall pay $860.93 on or before the 3rd of each month for this mortgage to be paid through the Trustee. Further, the Debtor shall maintain insurance on all property subject to the Arthur mortgage and provide proof to Arthur. Finally, the Debtor shall pay all property taxes due on or before December 31, 2011, and every December 31st thereafter. Should Debtor neglect to comply with any of these requirements Arthur shall provide written notice of the default to Debtor and his attorney; if the default is not cured within 10 days from the date of the mailing of the notice, Arthur may request a renewed hearing on his Motion for Relief from Stay.[17]

---

[17] The Court has been advised that Arthur has terminated his Counsel's representation. If Arthur seeks a renewed hearing based on a default, he must do so in writing and mail or deliver

Arthur or his counsel are directed to file a claim for all arrears he claims are due; if they are in dispute, Debtor's counsel may file an objection to claim. The Trustee is directed to pay Arthur as a pass through payment $860.93 per month on Proof of Claim # 4B beginning as soon as practicable. Further, the Trustee is directed to disburse the additional $76.00 paid semi-monthly being escrowed by the Trustee since the trial of this matter if and when Arthur properly files a post-petition arrearage claim. The Debtor's plan payments, unless otherwise ordered, shall be $812.50 semi-monthly and shall be made by the 15th and 30th of each month by cash, cashier's check or money order. Debtor's counsel is directed to review the confirmed plan and if necessary file a Motion to Alter or Amend if the mortgage obligation to Arthur including the balloon note will not pay out in full during the term of this case.

Arthur's Motion for Relief is DENIED conditioned upon Debtor complying with the terms and provisions of this ORDER.

Dated: November 3, 2011

/s/ Tamara O. Mitchell
TAMARA O. MITCHELL
United States Bankruptcy Judge

TOM: dgm
xc: Debtor
    Thomas Buck, counsel for Debtor
    Rebecca Bozeman, counsel for James Arthur
    James Arthur
    Mary Frances Fallaw, counsel for the Chapter 13 Trustee

---

said pleading to this Court and mail a copy to Debtor's counsel and the Trustee.